# R.B. HAZARD, INC.

## v.

## JOHN PANCO, ET AL.

Record No. 900056

November 9, 1990

Present: All the Justices

Palmer S. Rutherford, Jr. (James C. Howell; Willcox & Savage, on briefs), for appellant.

Robert S. Brewbaker, Jr.; Stephen Merrill (Browder & Russell, on brief), for appellees.

JUSTICE LACY delivered the opinion of the Court.

In this appeal we determine whether the trial court erred in submitting issues of federal contractor immunity and contractor negligence to the jury.

On the morning of October 11, 1985, John Panco, a non-commissioned officer in the Army, attempted to open a gate leading to a temporary storage facility for land air-cushioned vehicles, generally known as hovercraft, at Fort Story, Virginia. While he was moving the gate it fell on him, dislocating his toe. Because of this injury, Panco eventually was given a medical discharge from the Army.

Panco filed a motion for judgment against R.B. Hazard, Inc., and Thomas DeSantis, Jr., t/a Fence World, the general contractor and installer of the gate, respectively, seeking damages for his injury. Panco alleged that Hazard and DeSantis were negligent in improperly constructing and securing the gate and that they had breached the warranty of fitness.

The case was tried by a jury, which returned a verdict for Panco, against Hazard for $250,000 and exonerated DeSantis. The trial court denied Hazard's motion to set aside the verdict and entered judgment on the verdict. We granted Hazard an appeal limited to its contentions that 1) the trial court erred in deny-

ing its motions to strike and to set aside the verdict because it was entitled to immunity under the federal contractor defense doctrine, and 2) Panco had failed to establish any negligence or breach of warranty by Hazard which proximately caused Panco's injuries. Under well-established principles, we consider the evidence in the light most favorable to Panco.

The United States Army employed an architectural firm to prepare plans and specifications for a temporary storage facility at Fort Story for the hovercraft. The plans included perimeter fencing and gates. The U.S. Army Corps of Engineers reviewed and approved the plans and, in January of 1984, awarded R.B. Hazard, Inc. several construction contracts based on the plans, including one for construction of the perimeter fencing and gates.

Hazard subcontracted with Central Fence of CNY, Inc. to manufacture and with Fence World to install the gate. Thomas DeSantis, Jr., Fence World's representative, installed the gate under Hazard's supervision.

Installation of the gate began in July 1985 and was completed on August 21, 1985. The gate was a single cantilever gate, 51 feet long, and weighed approximately 1,000 pounds. It was designed to open and close on rollers operating along a track with a tire on the end of the gate. Hazard's employees poured the asphalt pad which was to serve as the surface across which the gate would roll. The plans called for the pad to incline to facilitate drainage. DeSantis testified that because the pad was uneven, the gate he installed would not remain closed and would roll open on its own. DeSantis told Jesse Page, the quality control supervisor for Hazard, that in order for the gate to hang correctly, the asphalt pad should be repoured. However, DeSantis was told to do the best he could with the existing pad. DeSantis then raised the end of the gate to prevent it from rolling. As a result, the entire weight of the gate rested on the gate post and one pulley. When the gate was in motion there was a gap between the top rail of the gate and the pulleys. Additionally, the tire and rollers on the bottom of the gate did not touch the ground. DeSantis testified that he did not think the gate would hold up.

A "pre-final" inspection of the temporary maintenance facility was held on August 19. Twelve people attended, including nine representatives of the Corps of Engineers and the Army. The gate was opened and closed successfully at this inspection. By letter

dated August 29, 1985, the Army notified Hazard that the facility, including the gate, was accepted as of August 19, 1985.

The gate was used daily. During the early morning hours of October 11, 1985, as the gate was opened, it fell, damaging a soldier's car. The gate was placed upright and left partially open. Approximately two hours later, as Panco was opening the gate, it fell again, resulting in the injuries which are the subject of this suit.

## Federal Contractor Defense

The issue of the federal contractor defense was submitted to the jury by the following instruction:

Contractors who are performing work for the United States government are immune from liability for negligent design or installation methods of equipment if it is established by a preponderance of the evidence that each of the following elements [is] present:

(1) The contractors were provided with reasonably precise drawings and specifications as they relate to design and installation method.

(2) The product produced by the contractors complied with the government's drawings and specifications as they relate to design and installation method.

(3) The contractors informed appropriate government officials of any safety hazards they were aware of but the appropriate government officials were not aware of.

If you do not find by a preponderance of the evidence that each of these elements is present, immunity does not apply to the contractors.

Hazard contends that, while the instruction correctly reflects the criteria adopted in *Boyle* v. *United Technologies Corp.*, 487 U.S. 500, 512 (1988), for establishing the federal contractor defense, submission of the issue to the jury was error.[1] The evidence, Haz-

---

[1] While the applicability of this instruction to installation is not disputed by Hazard, the government contractor defense considered in *Boyle* was not applied to installation as set out in the instruction or to negligent construction as alleged in the motion for judgment here, and "*Boyle*, by its terms, applies only to defects in design." *Harduvel* v. *General*

ard argues, showed that the criteria were met and, therefore, Hazard was entitled to judgment in its favor as a matter of law.

■ As the Court said in *Boyle*, "whether the facts establish the conditions for the defense is a question for the jury." *Boyle*, at 514. Only if "no reasonable jury could find, . . . on the basis of the evidence presented, that the Government contractor defense was inapplicable," *id.*, would Hazard be entitled to judgment as a matter of law.

A review of the record shows contradictory testimony on a number of matters relating to the *Boyle* criteria. For example, it is not clear whether the product complied with the government's plans and specifications—the second prong of the *Boyle* test. The U.S. Army Corps of Engineers' administrator for construction projects at Fort Story in 1985, and the Corps' contract administrator for the project at issue here, both testified that the gate and pad were accepted and approved as tendered in conformance with the plans. However, their testimony also contained statements that the plans' specifications were not met if the wheels did not touch the ground, if the grade of the pad caused the gate to open by itself and if the rail at the top of the gate was bent and not flush with the pulley.

Hazard discounts these comments, however, contending that acceptance of the project by the Army conclusively establishes compliance with the plans and satisfies the second prong of the test, citing *Harduvel* v. *General Dynamics Corporation*, 878 F.2d 1311, 1317 (11th Cir. 1989), *cert. denied*, 110 S.Ct. 1479, *reh. denied*, 110 S.Ct. 2199 (1990); *Smith* v. *Xerox Corp.*, 866 F.2d 135 (5th Cir. 1989); and *Niemann* v. *McDonnell Douglas Corp.*, 721 F.Supp. 1019 (S.D. Ill. 1989). These cases are distinguishable from the instant case and do not support Hazard's proposition.

■ In *Niemann* and *Smith*, the court found that product acceptance was probative evidence of compliance and was not contradicted by evidence tending to show that the product was not made in accordance with the plans. In the absence of such contradictory evidence, the court found the second prong of *Boyle* was met. 721 F.Supp at 1027; 866 F.2d at 138-39. Here, there was testimony "tending to show" non-compliance with the plans, creating a jury issue as to the second prong of the criteria.

---

*Dynamics Corp.*, 878 F.2d 1311, 1317 (11th Cir. 1989), *cert. denied*, 110 S.Ct 1479 (1990) (citations omitted). So long as the claim is based on a design defect, the defense applies whether the theory of recovery is based on negligence, breach of warranty, or strict liability. *Tozer* v. *LTV Corp.*, 792 F.2d 403, 408 (4th Cir. 1986).

■ In *Harduvel*, the court stated that "[i]f a defect is one inherent in the product or system that the government has approved, it will be covered by the defense," 878 F.2d at 1317, but then went on to say that if the defect "is merely an instance of shoddy workmanship" the defense is inapplicable regardless of acceptance. *Id*. Again, the testimony here raised questions as to the workmanship and the adjustments made to correct the problems stemming from the angle on which the pad had been poured.

■ Based on the conflicting testimony in this record, we agree with the trial court that whether Hazard met its burden of proving his entitlement to the federal contractor defense was an issue of fact to be determined by the jury.

### Negligence

Hazard also argues that Panco failed to establish that it was negligent or breached any warranty and that, even if it were negligent, there is no evidence that its negligence caused Panco's accident, particularly in light of the accident earlier that morning, after which the gate was placed upright.[2]

In addition to the testimony set out above which implies negligence on Hazard's part, DeSantis testified that Hazard refused to incur additional costs to correct the pad its employees had poured. To compensate for the uneven pad, DeSantis had to make certain adjustments and he testified that, as a result, he did not think the gate would hold up. Finally, both of Panco's experts testified that the installation of the gate was not in compliance with industry standards and created a reasonably foreseeable probability that the gate would collapse at some point.

■ This evidence supports a jury determination that Hazard was negligent in the installation of the gate.

In order to relieve a defendant of liability for his negligence, negligence intervening between the defendant's negligence and the injury "must so entirely supersede the operation of the defendant's negligence that it alone, without the defendant's [negligence contributing] thereto in the slightest degree, produces the injury."

[2] The jury found that the earlier accident did not constitute an intervening cause and that issue is not before us.

*Coleman* v. *Blankenship Oil Corp.*, 221 Va. 124, 131, 267 S.E.2d 143, 147 (1980) (quoting *Richmond* v. *Gay*, 103 Va. 320, 324, 49 S.E. 482, 483 (1905)).

    ■ Given the testimony that the gate's failure was foreseeable, it was reasonable to expect that when the gate fell, it would be righted and subject to falling again. Hazard's initial negligence commenced this course of action, and ultimately resulted in Panco's injuries. *Hines* v. *Garrett*, 131 Va. 125, 108 S.E. 690 (1921); *Scott* v. *Simms*, 188 Va. 808, 51 S.E.2d 250 (1949). Like the federal contractor defense issue, this issue was properly submitted to the jury. Hazard was not entitled to a judgment in its favor as a matter of law.

    The judgment of the trial court will be

*Affirmed.*