16 F.3d 409
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 Ardeshir DANESHMAND, Plaintiff-Appellant,
v.
R.B. HAZARD, INC.; Thomas Desantis, Jr., a/k/a Fence World;
Central Fence of CNY, Incorporated, Defendants-Appellees,
v.
Mallory Electric Company, Third Party Defendant-Appellee.
 No. 92-1856.
 United States Court of Appeals, Fourth Circuit.
 Argued: March 1, 1993.
Decided: January 10, 1994.
 
 1
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Robert G. Doumar, District Judge. (CA-91-570-N)
 
 
 2
 Stephen Gary Merrill, Norfolk, Virginia, for Appellant.
 
 
 3
 Stephen Royce Jackson, Willcox & Savage, P.C., Norfolk, Virginia; Peter Clark Manson, Jr., Pender & Coward, Virginia Beach, Virginia, for Appellees.
 
 
 4
 Philip J. Infantino, Pender & Coward, Virginia Beach, Virginia, for Appellees.
 
 
 5
 E.D.Va.
 
 
 6
 AFFIRMED.
 
 
 7
 Before PHILLIPS and MURNAGHAN, Circuit Judges, and HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.
 
 OPINION
 
 8
 PHILLIPS.
 
 
 9
 Ardeshir Daneshmand appeals from an adverse judgment in his personal injury action against a number of government contractors and subcontractors who participated in the manufacture and installation of a fence gate which fell upon Daneshmand at a military installation. We affirm.
 
 
 10
 * In January of 1986, then-Sergeant Ardeshir Daneshmand was detailed to close a gate in a large fence enclosing the Fort Story hovercraft facility in Virginia Beach, Virginia. While he and another soldier were closing the gate, it collapsed on Daneshmand, causing injuries, primarily to his lower back. As a result, Daneshmand was forced to accept a hardship discharge from the Army in which he received a VA disability rating of twenty percent.
 
 
 11
 A similar though not identical gate in the same fence installation had collapsed twice in October 1985, first on Sergeant Lisa Booker's car and later on Sergeant John Panco's foot. Panco, who was medically discharged from the Army because of his foot injury, won a judgment in a Virginia state court action against the general contractor in charge of the overall fence installation project, R. B. Hazard, Inc. See R. B. Hazard, Inc. v. Panco, 397 S.E.2d 866 (Va.1990). In that case, the Virginia court identified as the effective cause of Panco's injuries the sloping concrete pad over which the gate which injured him was installed and the adjustments made to the gate to compensate for that slope, holding Hazard responsible for these conditions.
 
 
 12
 Daneshmand brought this diversity action against Hazard, along with Thomas DeSantis, Jr., the gate's installer, and Central Fence of CNY, Inc., the subcontractor who built the fence and contracted with DeSantis to install it, alleging negligence and breach of various warranties. Hazard and Central Fence filed third-party complaints against Mallory Electric Company, Inc., which had installed a ground wire on the gate shortly before its collapse, seeking contribution for negligence and common law indemnity. Daneshmand sought compensatory damages from all three defendants and punitive damages from Hazard and Central Fence.
 
 
 13
 The district court granted summary judgment in favor of Hazard and Central Fence on the punitive damages claims. A jury trial on the remaining claims ended in a grant of judgment as a matter of law for all the defendants on all the claims at the conclusion of Daneshmand's case-in-chief.
 
 
 14
 This appeal followed. On it, Daneshmand assigns as error the district court's grant of judgment as a matter of law at trial, the court's earlier grant of summary judgment for Hazard and Central Fence on the punitive damages claims, and several of the court's evidentiary rulings.
 
 II
 
 15
 We first address the propriety of the grant of judgment as a matter of law at the conclusion of Daneshmand's case-in-chief.
 
 
 16
 Though Daneshmand's claims invoked both negligence and breach of warranty theories, an essential element of each was that a basic design defect known to but uncorrected by each of the appellee-contractors involved in providing the gate to the Army was a proximate cause of its fall and hence of Daneshmand's injuries.[1] And though the district court's oral ruling may be thought to have rested on several alternative grounds,[2] the central ground was the insufficiency of the evidence to support a jury finding on that critical causation issue. J.A. at 1238-39, 1247. Because we agree that that was a sufficient ground, we confine discussion to it.
 
 
 17
 In this circuit, a stringent standard is applied to determine the sufficiency of evidence to prove physical or motivational causation. We require that the evidence be sufficient to permit a jury rationally to infer the requisite cause as a "probable," not merely a "possible," one. See Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241-42 (4th Cir.1982) (because of the "impossibility of choosing rationally between mere 'possibilities' "); Wratchford v. S.J. Groves & Sons Co., 405 F.2d 1061, 1066 (4th Cir.1969) (Haynsworth, J.) (because "if the inference [of causation] ... lacks substantial probability, any attempted resolution of the question may well lie within the area of surmise and conjecture"); Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir.1958) (Haynsworth, J.) ("[p]ermissible inferences [of causation] must still be within the range of reasonable probability"); Ralston Purina Co. v. Edmunds, 241 F.2d 164, 168 (4th Cir.1957) (Sobeloff, J.) (only evidence "which shows a 'probability' and not a mere 'possibility' [of causation]" suffices). In applying that standard we of course are bound to give the non-moving party the benefit of every favorable inference, to accept the credibility of all favorable testimony, and to resolve any inconsistencies or conflicts in his favor. Garraghty v. Jordan, 830 F.2d 1295, 1302 (4th Cir.1987). But in doing so, we may take into account all the evidence bearing upon potentially dispositive issues that is not contradicted or in direct conflict with that favorable to the non-movant. St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1008 (4th Cir.1985).
 
 
 18
 Here, Daneshmand's factual theory of causation, critical to all of his legal theories, was that, as designed, and as was readily apparent to each of the defendant-contractors, the gate was simply too heavy and its supporting elements too flimsy to be operated with safety by those opening and closing it; that these structural deficiencies were bound in time to cause the gate to fall; and that, because uncorrected by each of the defendant-contractors, these deficiencies did in fact cause it to fall and injure Daneshmand.[3] But the evidence offered to prove that uncorrected structural deficiencies were the cause in fact of the gate's fall and the resulting injury sufficed only to show this as one of several equally arguable possibilities.
 
 
 19
 In the first place, the evidence of just what acted as the immediate physical cause of the collapse was by no means certain. Direct eyewitness testimony established only that the gate fell while Daneshmand and another soldier were pushing one of its two sections into closed position, but did not establish more detail of the immediate physical cause. The opportunity for physical inspection of the gate after its fall was limited to a period of two weeks, at the end of which someone destroyed it. For this reason, the fallen gate was not available as a physical exhibit at trial and its physical construction and mode of operation had to be put in evidence by the testimony of persons who saw it during installation and operation before the collapse and during the brief post-fall interval before its destruction, aided to some extent by photographs and copies of plans and specifications. As a result, the evidence of just exactly what acted as the immediate mechanical cause of the collapse was not flatly established.
 
 
 20
 The best evidence on this point from Daneshmand's standpoint was that the immediate cause was the slipping down of the front one of the two bottom rollers on which the gate rested in travel, thereby causing the gate to drop from the lateral support provided by the upper rollers, hence to fall.[4] But the question of what had caused the lower roller to slip--the most critical link in the legal causation chain back to any conduct of the contractor defendants--was even more speculative, leading in the end only to equally uncertain possibilities. The best evidence on this point from Daneshmand's standpoint was the opinion testimony of an engineering expert, Scott, and of a contractor, Stenke, who had bid unsuccessfully for the job (neither of whom had seen the gate) that the design of the gate--its weight and configuration--was such that the stresses of normal operation would in time so weaken its supporting elements--including the rollers--that just such a collapse as occurred was inevitable. But neither of those witnesses, nor any other witness, was able to testify with any assurance that normal operation rather than supervening extraneous forces had caused the crucial slipping down of the offending bottom roller. And two such possibilities, neither directly contradictory of any evidence favorable to Daneshmand on this critical question, were developed by the evidence.
 
 
 21
 First, there was uncontradicted evidence that during its operation, the gate had actually been subjected to abusive, rather than normal, operation by military personnel. Specifically, there was evidence that military personnel had frequently slammed the gate open and shut with such unneeded force as to weaken or warp the alignment of the critical rollers which supported the gate, and to dislodge its supporting wheels, and that they had on at least one occasion used a truck to push the gate to the desired position.
 
 
 22
 Second, there was uncontradicted evidence that following the gate's installation by DeSantis, Mallory Electric Co., the electrical sub-contractor that was not joined as an original defendant, had improperly installed a copper cable (to ground the force for lightning protection) by running it through the rollers' supporting brackets that were attached to the metal fence post next to the gate opening rather than, as was proper, by using independent support. And there was further evidence, not directly contradicted by any other, that this was the precipitating physical cause of the offending roller's slippage, hence the gate's fall. Specifically, Donald Dow, the Corps of Engineers' area engineer, opined on the basis of his post-accident inspection of the gate that the bracket supporting the offending roller had been loosened in order to attach the cable to it, and in consequence had slipped down. J.A. at 364. Thomas DeSantis, the sub-contractor who installed the fence opined more specifically, on the basis of his postaccident inspection of the gate, that the bracket and roller had dropped "a good inch and a half" and that it did so because the cable's placement had made it impossible to tighten down the u-bolts supporting the bracket and roller sufficiently to prevent the slippage that occurred. J.A. at 465.
 
 
 23
 On this state of the evidence as to the legal cause of Daneshmand's injury, we conclude, with the district court, that any uncorrected structural deficiency of the gate that could be attributable to the conduct of any of the defendant-contractors exists only as, at best, one of several equally plausible possibilities for its fall and not as a probability sufficient to support a rational jury finding. On this basis, applying our standard for assessing the sufficiency of the evidence to prove causation, we agree with the district court's assessment that all the claims fail as a matter of law on this element.[5]
 
 III
 
 24
 Daneshmand also assigns as error the district court's exclusion of testimony from the Panco trial, a DeSantis deposition, and the proposed expert testimony by recall of George Stenke. All involved discretionary rulings which we review only for abuse, and we find no abuse as to any of the rulings.
 
 
 25
 * In excluding testimony from the Panco trial, the district court relied in part on its judgment that "there is no showing that this incident with regard to the first gate is the same as the second gate." J.A. at 892. Given that the Virginia courts attributed the collapse of the Panco gate to the uneven concrete paid beneath it and "adjustments made to correct the problems stemming from the angle on which the pad had been poured," Panco, 397 S.E.2d at 869, the district court's assessment was well within its discretion.
 
 B
 
 26
 The district court also did not abuse its discretion in refusing to admit the DeSantis deposition as substantive evidence. Daneshmand did not list this deposition and did not list DeSantis' as a de bene esse deposition in the witness list submitted for the Final Pretrial Order, though he did list DeSantis as a fact witness. J.A. at 166-169. Daneshmand's only indication that he intended to use this deposition was in a letter to the defendants' attorneys in which his attorney stated that "I also intend to employ relevant portions of other depositions ... in impeachment or rebuttal of trial testimony. These include the transcripts of testimony of Mr. DeSantis...." J.A. at 858. On the basis of this letter, the district court allowed Daneshmand to use the deposition for impeachment and rebuttal purposes only. This was a proper exercise of discretion.
 
 
 27
 Furthermore, as Daneshmand failed to make an offer of proof to the district court on the deposition pursuant to Fed.R.Evid. 103(a)(2), he has not properly preserved this point for review.
 
 
 28
 Finally, we note that on the critical causation issue, the DeSantis deposition actually appears to be detrimental to Daneshmand's case, for in this deposition, DeSantis explained in even greater detail than he testified at trial why he knew "for fact" that the installation of the copper wire had caused the gate to fall. J.A. at 1553-1557.
 
 C
 
 29
 The district court's refusal to allow Daneshmand to recall his witness, George Stenke, as an expert witness during his case-in-chief was based on the fact that Stenke had already substantially offered the opinion testimony Daneshmand now argues he intended to elicit by recalling him.[6] Moreover, Stenke's affidavit regarding what he was prepared to testify reveals that such testimony could not have helped Daneshmand to establish causation, as it was essentially only a repetition of his opinion that the gate's excessive size and weight could have caused it to fall.
 
 AFFIRMED
 
 
 [1]
 Daneshmand's theories of recovery were a hodge-podge of negligence and warranty whose imprecise development caused confusion throughout the district court litigation. A pre-trial order rejected any right to recover against any of the named defendants--none of whom designed the gate--on any theory of design defect, in response to Daneshmand's contention that, though not pleaded, such a theory could be asserted. J.A. at 105
 As presented at trial and on this appeal, the negligence theory as to Hazard was that it breached a duty of care owed to Daneshmand (and other "users") of the gate, by failing to supervise and prevent its installation in a known defective state and thereafter in failing to correct it. Appellant's Br. 25, 26; against Central Fence, the gate's sub-contractor manufacturer, that it breached a duty of care to potential users of the gate by building it according to a design that it knew posed a danger, id. 28; against DeSantis, the sub-contractor installer, that he failed to warn of or correct the same known danger. Id. 30. While there are significant problems other than causation about the application of these negligence theories to the evidence advanced in their support, causation is of course an essential element of each.
 The warranty theory as presented at trial and on this appeal was that "[e]ach of the contractors breached a warranty of fitness for a particular purpose in building and selling the gate, and that this warranty was "extended ... by operation of law" to "third parties" such as Daneshmand. Appellant's Br. 31. As with the negligence theories, though there may be significant problems other than causation in applying such a warranty theory to these contractors, causation is in any event an essential element whose failure of proof defeats the claim.
 
 
 [2]
 As to negligence: problems of vicarious liability, J.A. at 1218, 1226, and of the breach of any duty owed, id. at 1229-1236
 As to breach of warranty: problems of privity, id. at 1243; and of third-party beneficiary, id.
 
 
 [3]
 The design of the gate was of course critical to the prosecution of all the claims, whether of negligence or warranty. For our purposes, the critical elements of the design can be summarized. The"gate" in question was actually one of two 40-foot sections of a "rolling" metal gate seven feet high that was designed to close an eighty-foot gap in the facility fence. The two 40-foot sections closed and opened by"rolling," in a direct line of the fence (rather than by "swinging" open and shut), along a track formed by metal "rollers", two upper and two lower, mounted on fence posts, that partially enclosed the gate's upper and lower horizontal members and kept it on line as it "rolled" either to open or closed positions. A critical feature of the design for our purposes was that the gate was thereby held upright--prevented from falling--by its "fit" within the two sets of rollers, one upper and one lower, so that any slippage of either upper or lower rollers that destroyed the fit would affect the lateral support of the gate that the "rollers" supplied
 A subsidiary feature of the design that figured heavily in testimony but, as it turned out, not at all in a proper assessment of the claim, were "wheels" (not the fence-mounted "rollers") attached to the bottom of the leading edges of the gate sections. These provided additional support to the gate sections as they neared their closed positions, by touching and traveling along the concrete ground surface of the gate opening.
 
 
 [4]
 See note 3, supra
 
 
 [5]
 This conclusion makes it unnecessary to address Daneshmand's separate challenge to the dismissal of his punitive damages claims against Hazard and Central Fence by summary judgment
 
 
 [6]
 Although Stenke did not testify that the gate's excessive size and weight could cause it to fall, as his affidavit indicates he was prepared to testify, he did state during the trial that he was "very concerned from a safety standpoint" with the gate's design and had insisted that he "would have to be indemnified if we did it that way." J.A. at 228. Viewing this testimony in the light most favorable to Daneshmand, we accept it as opinion testimony that the gate's excessive size and weight could cause it to fall. Thus, it adds nothing, as indeed Stenke's affidavit adds nothing, to the speculative causal testimony of Scott and Bretz