[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: ON MOTIONS FOR SUMMARY JUDGMENT
The three defendants in these two cases have filed motions for summary judgment on the ground they are immune from suit under the government contractor defense. Since the factual and legal basis of the defendants' motions are similar if not identical, they are considered together.
These wrongful death, products liability actions arise out of a plane crash in Egypt on January 20, 1983 of an F-16 jet fighter aircraft owned and operated by the Egyptian Air Force. Two Egyptian pilots, Mohamed Abdul-Samed Dighidi (Dighidi) and CT Page 6824 Gamel Al-Moghraby Hassan (Hassan) died in the crash. The plane had been sold by the United States government to the government of Egypt following the Camp David Accords. It is undisputed that the plane crashed following failure of the main fuel pump during the flight as a result of a condition common to similar pumps known cavitation erosion. The main fuel pump, MFP-330 was manufactured by Chandler-Evans, Inc. The fuel pump was a component of the F-100PW-200 engine, which was manufactured by United Technologies Corporation (UTC). General Dynamics Corporation was the manufacturer of the F-16 air frame.
The plaintiff Sigmund Miller was appointed administrator of the estates of Dighidi and Hassan. The first action was commenced in his capacity as temporary administrator of both estates, and the second action was brought as permanent administrator of both estates, but the complaints in both actions are similar.
In June, 1991 the defendants filed an offer of judgment for $300,000 for the Dighidi estate and $200,000 for the Hassan estate. The plaintiff accepted the $200,000 offer judgment and rejected the $300,000 offer. Since the government contractor defense was raised after the offer of judgment was accepted for the Hassan estate, the ruling on the motions for summary judgment applies only to the Dighidi estate.
1. Law to be applied
The question has been raised as to whether Connecticut law or Egyptian law applies to this case. The plaintiff's complaint makes products liability claims against all defendants with separate counts of negligence, breach of warranty and strict liability. The factual basis of the theories of liability in the complaint all relate to improper design, manufacture and/or assembly of the fuel pump in the F-16 engine and failure to warn of the dangers of fuel pump failure. All these theories are considered products liability claims under Connecticut law. 52-572(m) Conn. General Statutes. A products liability claim is a substitute for all other claims against product sellers, including actions of negligence, strict liability and breach of warranty for harm caused by a product. Section 52-572(n) Conn. General Statutes; Daily v. New Britain Machine, Co., 200 Conn. 562, 571,512 A.2d 893 (1986); Winslow v. Lewis-Shepard, Inc., 212 Conn. 462, 465,562 A.2d 517 (1989). CT Page 6825
The plaintiff has elected to proceed in state court in Connecticut where the fuel pump and aircraft engine were produced, using pleadings which follow Connecticut statutory law on products liability. While the plaintiff could have commenced this action in Egypt he brought it here, and successfully opposed the defendants' motion to dismiss on grounds of forum non conveniens. Miller v. United Technology Corp., 40 Conn. Sup. 457, 467, 515 A.2d 390 (1986). While that opinion stated as dicta that under Connecticut conflicts of law concepts Egyptian law would control as the place of the accident, Id., 466, that is not the law of the case. Moreover, even if it were, it does not have to be followed by another judge at a later stage of proceedings if it appears incorrect or prejudicial. Breen v. Phelps, 186 Conn. 86, 99-100,439 A.2d 1066 (1982). Connecticut has since abandoned the rule that the law of the place of the injury controls in tort actions, substituting instead the contacts theory stated in Restatement Second of Conflict of Laws, 6 and 145. O'Connor v. O'Connor, 201 Conn. 632, 648-652, 519 A.2d 13 (1986). Under that approach "the rights and liabilities of the parties with respect to an issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in 6." Id., 650; Restatement Second of Conflict of Laws, 145(1). Section 6 of the Restatement contains guidelines to be followed on choice of law, and 145(2) contains factors to be considered when applying the principles of 6 to determine an issue. O'Connor v. O'Connor, supra 651, 652.[1] Among other considerations, the fuel pump, engine and air frame were manufactured in Connecticut, the defendants are based in and sell their products from this state. Applying Connecticut law to products liability claims insures uniformity of results for similar factual claims, which would not occur if the law of a another state or a foreign country were applied merely because the defective product caused a plane crash in that jurisdiction. More important, the government contractor defense, developed under federal law for important national policy reasons, would be undercut if it could be defeated by applying the law of another country merely because a military plane crashed outside the United States. Accordingly, Connecticut law governs this dispute, except to the extent that it is superceded by the government contractor defense. This approach has been followed elsewhere. Carlenstolpe v. Merck, 638 F. Sup. 901, 905-10, CT Page 6826 (S.D.N.Y. 1986), affirmed 819 F.2d 33 (2nd Cir. 1986) (Pennsylvania law applied in a products liability action in New York commenced by a Swedish resident for an accident occurring in Sweden since the design, development testing and manufacturing of the product occurred in Pennsylvania).
2. Summary judgment test and material facts in this case
A summary judgment may be granted under 384 of the Connecticut Practice Book if the pleadings, affidavits and other proof submitted with the motion show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Connelly v. Housing Authority, 213 Conn. 354, 364, 567 A.2d 1212 (1990); Bartha v. Waterbury House Wrecking Co., 190 Conn. 8, 11,459 A.2d 1715 (1983). To prove that there is no genuine issue as to any material fact, the moving party must show that it is quite clear what the truth is, and that it excludes any real doubt as to the existence of any material fact. Fogarty v. Rashaw, 193 Conn. 442, 445, 416 A.2d 582 (1984). A material fact has been defined as a fact that will make a difference in the result of the case. Hammer v. Lumberman's Mutual Casualty Co., 214 Conn. 573, 578, 573 A.2d 699 (1990); Booth v. Flanagan, 23 Conn. App. 579, 584, 582 A.2d 1178
(1990). A genuine issue has been described as either a triable or substantial or real issue of fact and one which can be maintained by substantial evidence. Craftsmen, Inc. v. Young,18 Conn. App. 463, 465, 557 A.2d 1292 (1989); United Oil Co. v. Urban Redevelopment Commission, 158 Conn. 364, 378,260 A.2d 596 (1969). In determining whether there is a material issue of fact, the evidence is considered in the light most favorable to the nonmoving party. Connell v. Colwell 214 Conn. 242, 246,247, 571 A.2d 116 (1990). Once the moving party has presented evidence in support of the motion for summary judgment, the opposing party must present evidence that demonstrates the existence of some disputed factual issue. State v. Goggins,208 Conn. 606, 616, 546 A.2d 250 (1988); Daily v. New Britain Machine Co., supra 568. General claims and conclusory statements that there is a material issue of fact are insufficient to defeat the motion. Id., 569; Burns v. Hartford Hospital, 192 Conn. 451, 455, 472 A.2d 1257 (1984). The party opposing the motion must raise evidentiary facts or substantial evidence outside the pleadings for which the material facts alleged in the pleadings can reasonably be inferred. Sheridan v. Board of Education, 20 Conn. App. 231, 239, 565 A.2d 1882
CT Page 6827 (1989); State v. Goggins, supra, 616. 617.
Where there is no genuine issue as any material fact, the next question is whether the moving party entitled to judgment as a matter of law. Bartha v. Waterbury House Wrecking Co., supra, 11. That is resolved applying to the established facts the same test as is used in determining whether a party is entitled to a directed verdict on the same facts. Connelly v. Housing Authority, supra 364; Connell v. Colwell, supra, 247.
In many cases of this type summary judgment would not be appropriate since there are often factual questions as to the cause of the airplane crash, whether it resulted from human error or a defective component of the aircraft, and whether the failure of the component resulted from a defect in its design or manufacturing of the product. Moreover, summary judgment is not well designed to dispose of complex cases. United Oil Co. v. Urban Redevelopment Commission, supra, 375. Despite the general complexity of this case, the cause of the crash of the F-16 is not a disputed fact, and the motions for summary judgment are addressed only to a narrow component of the case, the government contractor defense. The essential, undisputed facts from admissions in the pleadings and the documents filed by the parties are as follows:
On January 20, 1983 the decedents, Colonel Dighidi and Major Hassan were pilots in the Egyptian Air Force and were killed in a crash of a F-16 fighter aircraft. The F-16, a single engine airplane, was delivered by General Dynamics Corp. (GD) to the USAF on March 12, 1982, which later transferred it to the Egyptian government. The engine for the F-16 was designed and manufactured by Pratt Whitney Aircraft (PWA), a division of the defendant United Technology (UTC). The defendant Chandler-Evans Inc. designed and manufactured the main fuel pump for the F-16 engine, although others also participated in the design, manufacture and assembly of the pump. The UTC engine containing the Chandler-Evans fuel pump was installed in the F-16 by GD. The pump and the engine were designed in accordance with specifications reviewed and approved by the United States Air Force (USAF), and similar engines and pumps were used on other F-16s built by GD prior to 1983. [PWA F-16 engines were designated F-100-PW-200, and the Chandler-Evans fuel pumps were designated MFP-330.] The designations for the engines and the pumps remained the same at all relevant times even though they went through several changes. CT Page 6828
The engine in the plane flown by the decedents on January 20, 1983 lost all power during flight when the MFP-300 main fuel pump failed because of cavitation erosion after 230 hours of operation. The decedents then attempted an emergency landing but failed to eject from the aircraft before it struck the ground, even though the F-16 was equipped with a pilot ejection system which was functional at low altitudes. The airplane was a F-16B produced pursuant to a contract between the U.S. government and General Dynamics in January, 1975 to produce F-16s for sale to the USAF. The PWA division of UTC had a separate contract for the production of the F-100PW-200 engine for the F-16. UTC subcontracted with Chandler-Evans for the MFP-300 main fuel pump. The USAF managed the F-16 program and worked with GD during the design, testing and manufacturing of the F-16. After the production of each F-16 aircraft the government inspected, approved and accepted it. When GD delivered aircraft the USAF executed a Department of Defense form (DD form 250) certifying that the aircraft complied with all specifications. The F-16B aircraft involved in this case was delivered to the USAF on March 12, 1982. Sometime thereafter the United States delivered it to the Egyptian Air Force.
In the 1960's PWA was awarded a government contract to develop the engine for the F-15 fighter aircraft. As the F-100 series engine for the twin engine F-15 was developed, the USAF System Program Office (SPO) established detailed specifications for the components of the F-100 engine. In 1970 PWA subcontracted with Chandler-Evans for it to design, develop and manufacture a variable displacement vane type main fuel pump to meet the government's revised F-100 series engine performance specifications. Chandler-Evans developed the MFP-300 by 1974, it complied with the government's revised F-100 series engine performance specifications, and was qualified for the F-15 aircraft. In January 1975 the USAF awarded PWA the contract for the F-100 engine for the F-16 aircraft. After a four year process of development and testing supervised by the USAF, PWA was given a construction contract in 1979 on the engines for the F-16.
The MFP-300 variable displacement vane pump was also developed with supervision by the USAF, and was qualified for production and use after extensive testing and evaluation. The pump was developed to and met government specifications. Chandler-Evans and the USAF were aware of a standard problem CT Page 6829 with high speed pumps, cavitation erosion, as a result of test programs run by Chandler-Evans and the USAF. Cavitation erosion is a natural result of pump operation with the MFP-330 and other pumps, and ultimately results in failure of the pump. For that reason, the government established maximum operating hours (MOH) for the pumps. The pumps were examined after about 200 hours of use, and based on how they looked the amount of operable hours left for each pump was estimated. The pump inspections on numerous engines established an MOH of 600 hours before overhaul for each pump. However, this was not a design specification for the main fuel pump, but rather a maintenance guideline for operational aircraft.
The cavitation problem with the MFP-330 resulted in attempts to produce a better fuel pump than the inlet vented side plate (IVSP). Chandler Evans then worked on developing a better pump, subject to government supervision and approval. The first new design was the discharge vented side plate pump (DVSP). Initial testing of the DSVP was favorable, but the cavitation problem intensified when the DVSP was placed in operation and the government ordered a return to the IVSP. No additional testing was needed to go back to the original design and the specifications were not changed. The next attempted revision of the fuel pump was the mod bypass configuration. This type of pump was approved for incorporation into the F-15 in 1981 and the F-16 in mid 1982, about six months before the crash. Approval of the mod bypass pump did not result in decertification of the IVSP, and there were still cavitation failures with the new pump. In 1985 the government approved changes in the F-100 engine, and the MFP-330 was replaced by a gear pump. The engine containing the MFP-330 with the IVSP fuel pump was incorporated into the F-100 engine which was accepted and approved by the United States government in 1981. The DD form 250 was signed by the government for the F-100 engine, and it states that the engine met all applicable specifications when accepted by the government.
3. Government Contractor Defense
In Boyle v. United Technologies Corp., 487 U.S. 500,108 S.CT. 2510, 101 L.Ed.2d 442 (1988), which involved a wrongful death claim arising out of a military helicopter accident, the United States Supreme Court resolved the conflict among federal courts and defined the government contractor defense, which shields manufacturers of military products from tort liability CT Page 6830 for product design defects. The basis for the defense is that in areas of uniquely federal interest such as the government procurement of military hardware, state law must be preempted and replaced by federal common law. Id. 487 U.S. at 504,510-12; Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1315
(11th Cir. 1989). Accordingly, Connecticut products liability law yields to federal law in this case. See Wahlstrom v. Kawasaki Industries Ltd., 800 F. Sup. 1061, 1063 (D. Conn. 1992). The defense follows the "discretionary function" exception to the Federal Tort Claims Act, 28 U.S. 2680(a), and protects the United States from liability for its agents' performance of duties involving governmental functions. Boyle v. United Technologies Corp, supra, 487 U.S. at 510-511. Without the defense the government's own tort immunity for its discretionary functions would be undermined. Contractors which are liable for design features on government contracts would predictably pass on the cost of liability to the government, undermining the concept of governmental immunity. Id., 511, 512; Harduvel vs. General Dynamics Corp., supra, 1315. The decision followed earlier rulings in the Fourth and Ninth Circuits approving the defense and establishing its components, Tozer v. LTV Corp., 792 F.2d 403 (4th Cir. 1986); McKay v. Rockwell International Corp., 704 F.2d 444 (9th Cir. 1983). Boyle v. United Technologies Corp, supra, 487 U.S. at 512.
"Liability for design defects in military equipment cannot be imposed pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. The first two of these conditions assure that the suit is within the area where the policy of the "discretionary function" would be frustrated — i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself. The third condition is necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability" Id., 487 U.S. at 512.
In order to obtain summary judgment the defendants must prove compliance with all three components of the Boyle test. They contend that the defense applies because there was CT Page 6831 constant interaction between the United States government and the defendants in the development of the fuel pump and engine in the F-16, and that they met the specifications. The defendants also claim that the defendants did not hide any of the defects in the main fuel pump from the government, which was aware of the cavitation problem to the same extent as the defendants.
The plaintiff claims that the government contractor defense does not apply here because (1) it applies only to military hardware sold to the federal government and not a foreign power; (2) the subject fuel pump was not approved by the government and the approved specifications were for the mod bypass pump (3) the pump did not conform to the MOH standard of 600 hours which is a specification; and (4) the defendants knew the pump was defective and failed to warn the Egyptians about it, and that this duty to warn exists independent of the Boyle defense.
Several federal cases have granted summary judgment based on the government contractor defense as applied to the sale of military hardware. Lewis v. Babcock Industries Inc., 985 F.2d 83
(2nd. Cir. 1993); Nicholson v. United Technology Corp.,697 F. Sup. 598 (D. Conn. 1988); Sundstrom v. McDonnell Douglas Corp., 816 F. Sup. 577, 587 (N.D. Cal 1993); (2 cases) Maguire v. Hughes Aircraft Corp., 725 F. Sup. 821 (N.D.J. 1989); Kleeman v. McDonnell Douglas Corp., 890 F.2d 698 (4th Cir. 1989) (Navy FA-18 aircraft), cert. denied 495 U.S. 953 (1990); Galik v. Lockheed Shipbuilding Corp., 727 F. Sup. 1433 (S.D. Ala. 1989). Skyline Air Service, Inc. v. G. L. Capps. Co.916 F.2d 977 (5th Cir. 1990). The Boyle defense can be established as a matter of law. In re Aircraft Crash Litigation Frederick, MD. 752 F. Sup. 1326, 1336 (S.D. Ohio 1990), affirmed Darling v. Boeing Co., 935 F.2d 269 (6th Cir. 1991), and cases cited therein. The defense applies to negligence and strict products liability actions and related state tort law claims. Skyline Air Service Inc. v. G. L. Capps Co., supra, 979; Smith v. Xerox Corp., 866 F.2d 135, 137 (5th Cir. 1989).
4. Government Approval of Reasonably Precise Specifications
The first requirement for the government contractor defense is that the United States government approved reasonably precise specifications. Boyle v. United Technologies Corp., 487 U.S. at 512. In Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1320 (11th CT Page 6832 Cir. 1989) it was held that the F-16 aircraft meets this requirement as a matter of law because General Dynamics and the USAF developed reasonably precise specifications which were incorporated into a design that the government subsequently reviewed and approved. The government contractor defense does not apply where the United States left the design, materials and method of construction entirely to the discretion of the contractor, or where only minimal or very general requirements are set for the contractor by the United States, but the first part of the test is met where the government reviewed and approved a detailed set of specifications. McKay v. Rockwell International Corp., supra, 704 F.2d at 450. The defense does not apply merely because a company supplied goods to the military, and where goods ordered by the military are readily available and substantially similar to products marketed to commercial users, the defense does not apply In re Hawaii Federal Asbestos Cases, 960 F.2d 806, 811 (9th Cir. 1992). (Asbestos insulation marketed and sold to commercial buyer and not specially manufactured for the military). The record here establishes that the main fuel pump in the F-16 engine was especially designed for a military project. This is not equipment generally available in the commercial market. The record also shows extensive government involvement in development, testing and modification of the fuel pump. The government was fully involved in establishing the specifications for the fuel pump. The purpose of the government participation requirement is to exclude from the defense those cases where the government merely "rubber stamps" a design. Lewis v. Babcock Industries, Inc., supra 87; Trevino v. General Dynamics Corp., 865 F.2d 1474, 1480, 1486 (5th Cir. 1989). That is not the case where there was a great deal of communication back and forth between the government and the contractor in the design and production of a piece of military equipment. Harduvel v. General Dynamics Corp., supra, 1320, 1321.
The plaintiff claims that the government did not approve of the fuel pump specifications since it directed Chandler-Evans to develop a new pump in an effort to cure the cavitation problem with the IVSP. Cases reviewing this type of claim have logically held that the product manufacturer does not have to produce a product to the highest level of current technology to rely upon the government contractor defense. Stated another way, the contractor is not deprived of the defense for a government approved product because it works with the CT Page 6833 government to develop an improved product. The record shows that the IVSP remained an approved design until the government changed its performance specifications and requirements in 1985 to permit a gear pump design. Where the originally approved military equipment continues to be approved, the fact that alternative designs are also approved or an improved product is under consideration does not preclude the defense. Lewis v. Babcock Industries, Inc., supra, 985 F.2d at 88; Ramey v. Martin-Baker Aircraft Co, 874 F.2d 946, 950-51 (4th Cir. 1989); Dow v. Textron Inc., 792 F.2d 409, 411, (4th Cir. 1986). If the product development of new components as a result of product improvement programs on military equipment prevented the defense, it would discourage research and development of safer more efficient military hardware, which is hardly in the national interest. Accordingly, where the government continues to accept military equipment that conforms with previously approved reasonably precise specifications for that product, the existence of improved technology does not prevent the defense. Lewis v. Babcock, supra, 89.
5. The equipment conformed to the specifications
The second component for the government contractor defense is that the equipment conformed to the government approved specifications. Boyle v. United Technologies Corp., supra,487 U.S. at 512. The purpose of the second element is to disallow the immunity defense where a defect arises from the contractor's failure to follow the required military specifications. To say that a product fails to conform to specifications is another way of saying that it was defectively manufactured. Harduvel v. General Dynamics Corp., supra, 878 F.2d at 1321. However, nonconformance to precise specifications must mean more than that the design of the product is defective, and a failure of the equipment alone does not show nonconformity with the specifications. Kleeman v. McDonnell Douglas Corp., supra, 890 F.2d at 703. The plaintiff must produce evidence to show that there was an actual defect in the manufacturing of the fuel pump, as opposed to cavitation problems inherent in the previously approved design of the fuel pump. Harduvel v. General Dynamics Corp., supra, 1331.
The doctrine of strict liability in tort in Connecticut recognizes that there are three types of product defects: (1) improper design; (2) manufacturing defects; and (3) failure to warn that a product is unreasonably dangerous. Giglio v. Conn. Light CT Page 6834 Power, Co., 180 Conn. 230, 235, 236, 429 A.2d 486
(1980). The second component of the defense considers whether the product failed because of a manufacturing defect, i.e. failure to conform to the specifications. As stated in Harduvel v. General Dynamics Corp, supra 1317,:
 "In determining whether a claimed defect is one of design `for purposes of the government contractor defense, the proper focus is the protection of discretionary government functions for which the defense is intended. If a defect is one inherent in the product or system that the government has approved, it will be covered by the defense. Where a defect is merely an instance of shoddy workmanship, it implicates no federal interest . . . Stated another way the distinction is between an unintended configuration, and an intended configuration that may produce unintended and unwanted results".
There is no evidence in the record that the failure of the main fuel pump was due to a manufacturing defect. The cavitation erosion problem was well known to the defendants and the government, as was the fact that all fuel pumps which conformed to the specifications would ultimately fail. The only question was when. It was also known that the rate of cavitation erosion varied from pump to pump, and that periodic inspections were required to determine when replacement or repair was necessary. The evidence in support of the motions shows production in conformity with the approved government specifications. There was no evidence that the fuel pump in the subject aircraft was not built in accordance with approved design and specifications. The design for the pump was approved after a bench qualification test designed to show that the pump met all government specifications and requirements.
Since the plaintiff did not raise a genuine issue of material fact with respect to a manufacturing defect, the second element of the defense is established. Sundstrom v. McDonnell Douglas Corp., 816 F. Supp. at 595. Moreover, the issuing of a form DD-250 after testing and inspection shows CT Page 6835 that the government accepted the product as meeting its requirements and specifications.
The plaintiff claims that since the pump failed after 230 hours that its failure to work for 600 maximum operating hours is nonconformity with a government requirement or specifications. The MOH, although set by the government, is not a requirement or specification, but rather a maintenance guideline. It is the maximum time allowed before the fuel pump is removed for inspection and overhaul. There is no specification requiring that all fuel pumps sold by Chandler-Evans had to survive for 600 operating hours in order to be an approved product. It was well known that the number of hours that the pump would last varied from one engine to another. The MOH guideline of 600 was a goal set by the Air Force. Failure to achieve such safety standards does not mean that equipment fails to conform to the specifications for the product itself. Kleeman v. McDonnell Douglas Corp., supra,890 F.2d at 700-01; Sundstrom v. McDonnell Douglas Corp., supra,816 F. Supp. at 584-85. The fact that some other F-100 engines in F-16s manufactured at a later date or installed during a scheduled overhaul of an aircraft may have been contained a different type of fuel pump does not mean that the engine in the subject aircraft, which had not been called in for overhaul, failed to meet previously approved government specifications for the engine and fuel pump. "Requiring a government contractor to conform its product to qualitative, precatory goals would entirely vitiate the Boyle defense." Id. In short, performance specifications or guidelines imposed for safety reasons are not the type of reasonably precise quantitative specifications to which the Boyle test refers. Id., 585.
6. The United States Government was warned about dangers in the product known by the defendants.
The third component of the government contractor defense is that the supplier warned the United States about the dangers in use of the equipment that were known to the supplier but not to the United States. Boyle v. United Technologies Corp.,487 U.S. at 512.
Liability for failure to warn has the negative effect on military procurement as outlined in Boyle, so the defense applies when an action is based on either an allegedly CT Page 6836 dangerous design defect or a failure to provide adequate warnings and instructions. Nicholson v. United Technology Corp., supra, 697 F. Supp. at 604. The duty to warn extends only to dangers in use of the equipment which are unknown to the government. Stout v. Borg-Warner Corp., 933 F.2d 331, 336
(5th Cir. 1991), cert denied 112 S.Ct. 584 (1991); Sundstrom v. McDonnell Douglas Corp., 816 F. Supp. at 590. The third component is met when there is evidence in the record that the government knew about the problem with the military product, and no evidence that there was any information known to the contractor which was not conveyed to the government. Harduvel v. General Dynamic Corp., supra, 878 F.2d at 1321. Here the government maintained control over the contents of warnings and provided operations, flight and maintenance manuals for the F-16. Where the government maintains control of the content of the manuals and revisions to them, the government contractor defense applies if there is no evidence of non-disclosure of material facts to the government by the contractor. Nicholson v. United Technology Corp., supra, at 605. The cavitation problem with the fuel pump was well known to the USAF. In Harduvel v. General Dynamics Corp., supra, 1321, the third component of the defense was met where there was no evidence in the record that General Dynamics possessed the knowledge of a problem with the F-16 that wire chafing was a graver danger than was disclosed to or known by the Air Force. Government knowledge of the cavitation problem is clearly shown by the record, and the danger of fuel pump failure is shown by the fact that the government established maximum operating hours for the fuel pump.
There is no requirement for the government contractor defense that the contractor notify anyone other than the U.S. government about dangers in use of the equipment. Requiring notification to anyone else would completely undercut the defense. While this a matter of common sense, cases have held that the duty to warn of dangers does not extend to pilots of military aircraft. McKay v. Rockwell International Corp., supra, 704 F.2d at 453, 455; Sundstrom v. McDonnell Douglas Corp., 816 F. Supp. at 596, 597. Since the contractors do not have to warn American pilots of cavitation problems and risks of the fuel pump in the F-16, they obviously have no duty to warn the Egyptian government or its pilots of the same danger in order to take advantage of the government contractor defense. Moreover, the government controlled the content of all information to foreign governments on the F-16 and its CT Page 6837 component parts. Federal law as set forth in Boyle supercedes warning requirements in state products liability law. In re Joint Eastern and Southern District New York Asbestos Litigation, 897 F.2d 626, 629 (2nd Cir. 1990), and cases cited therein.
7. The Defense is not precluded where military aircraft is sold to a foreign government.
The plaintiff attempts to avoid the government contractor defense by the fact that the United States sold the F-16 to Egypt. That argument amounts, in effect, to a claim that the defense which existed when the United States bought the F-16 aircraft was eliminated by the fact that for foreign policy reasons our government then elected to sell the same product, unchanged, to a foreign country. That approach would, of course undercut the policy reasons stated in Boyle for the government contractor defense. The purpose of the rule is that military hardware such as the F-16 aircraft is an important part of the United States defense program, and the government wants to provide for that defense at the lowest possible cost. If the government contractors are forced to bear the costs of judgments in tort liability actions by foreign governments, those costs would be passed on to the United States government or would discourage contractors from producing products for sale to the government, which would hamper development of military equipment. The plaintiff cites no authority that the defense is lost merely because the government sells military aircraft to a foreign country after procuring it from the contractors, and no justification for such an exception has been shown.
The defendants have established all of the components of the government contractor defense. There is no genuine issue as to any material fact. The defendants' motions for summary judgment are granted against the plaintiff as administrator of the Dighidi estate.
ROBERT A. FULLER, JUDGE