**Donna S. OLIVER, Administratrix of the Estate of Arthur Dwayne Oliver, Plaintiff–Appellant,**

v.

**OSHKOSH TRUCK CORPORATION, Defendant–Appellee.**

**Erik B. TATE and Shirl D. O'Brien–Tate, Plaintiffs–Appellants,**

v.

**OSHKOSH TRUCK CORPORATION, Defendant–Appellee.**

Nos. 96–1320, 96–1321.

United States Court of Appeals, Seventh Circuit.

Argued May 29, 1996.

Decided Sept. 23, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 25, 1996.

Edward E. Strain, III, David A. Sleppy, J. Edward Staples (argued), Cathey & Strain, Cornelia, GA, Robert L. Herman, Atlanta, GA, for Plaintiff–Appellant.

Thomas L. Smallwood (argued), Borgelt, Powell, Peterson & Frauen, Milwaukee, WI, for Defendant–Appellee.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

While on military assignment with the United States Marine Corps in Saudi Arabia, Corporal Arthur Oliver was killed when the MK–48 logistical support vehicle he was driving crashed and burned during a convoy operation. Corporal Erik Tate, who was riding in the MK–48, suffered severe burns in the crash. Each commenced separate products liability actions against Oshkosh Truck Corporation ("Oshkosh"), the manufacturer of the MK–48. The district court granted Oshkosh's motions for summary judgment on the basis of the government contractor defense articulated by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The plaintiffs now appeal the district court's entry of summary judgment. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

## BACKGROUND

On March 22, 1991, Corporal Arthur Oliver and Corporal Erik Tate were on military assignment with the United States Marine Corps in Saudi Arabia. Their unit was transporting food supplies from Saudi Arabia to Kuwait. Corporal Oliver was driving the fifth of thirteen MK–48 transport vehicles in the supply convoy; Corporal Tate was riding in the passenger seat.[1] Poor visibility from blowing dust caused the convoy to slow and, eventually, to stop. When the convoy stopped, Corporal Oliver was unable to stop his MK–48 in time to avoid a collision. His vehicle struck the right side of another MK–48 at the point where the fuel tank and exhaust pipe were located. An explosion followed. Corporal Oliver died from the burns he received in the crash. Corporal Tate suffered third-degree burns over most of his body, requiring the amputation of his left leg above the knee.

Corporal Oliver's estate and Corporal Tate brought separate product liability actions against Oshkosh, the manufacturer of the MK–48. The plaintiffs alleged that the muffler on the MK–48 was located dangerously close to the right side fuel tank. The MK–48 has two exposed seventy-five gallon fuel tanks located on each side of the vehicle. A single exhaust pipe is located on the right side of the vehicle and is positioned directly above and parallel to the right-side fuel tank. At its closest point, the exhaust pipe is 1.5 inches from the fuel tank.

---

1. The MK–48 is the front power unit of the MK–48–14, a fully articulated 8 × 8 logistical support vehicle. The "MK–14" is a flatbed trailer which is detachable from the MK–48 and can operate on its own power.

Oshkosh sought summary judgment on the basis of the government contractor defense established by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Because the government contractor defense depends significantly on the extent of government participation in the design of the product in question, the parties' submissions to the district court focused on the design, testing and production phases of the MK–48 procurement process.

The materials submitted to the district court establish that, during the late 1970's, the United States Marine Corps undertook a review of its transportation needs and concluded that the heavy-duty truck segment of the existing fleet was inadequate to meet its future needs. The Corps evaluated several commercially available tractors and heavy-haul trailers but quickly determined that these designs would not be suitable for the military missions envisioned for the vehicle. In December 1978, the Marine Corps announced that it was interested in obtaining information on other commercially available heavy-duty trucks and trailers. Twenty-one manufacturers, including Oshkosh, responded to the Corps' request.

The Marine Corps developed performance specifications, selection criteria and a test-planning document for the vehicle and trailer it sought. This information was distributed to the manufacturers that had responded to the earlier inquiry. In March 1980, the Corps commenced the official procurement process by publishing a Request For Proposals ("RFP") to find a manufacturer to build a prototype MK–48. The RFP defined operational, performance and containment specifications for the vehicle sought by the Corps. Ten manufacturers, including Oshkosh, responded to the RFP by submitting proposals. A Source Evaluation Committee, consisting of non-contracting civilian and military engineers, evaluated the proposals and recommended that Oshkosh be awarded the prototype contract. Oshkosh delivered

two prototype MK–48s to the Marine Corps in April 1981.

The Marine Corps assumed complete responsibility for testing the prototype MK–48s. The Corps subjected the prototypes to extensive operational, performance and durability testing and identified "literally ... hundreds" of changes that would have to be made before a production contract was awarded. R.54, Deposition of Major John L. Wozniak, at 26. These changes were identified by the Marine Corps, conveyed to Oshkosh, and then integrated into the MK–48 design by Oshkosh. Oshkosh made all of the design changes requested by the Marines and, at the conclusion of the testing phase, the Marine Corps awarded Oshkosh the MK–48 production contract.

The production contract provides that Oshkosh has "total design responsibility" and that "the submission and approval or disapproval by the government of any changes shall in no way relieve [Oshkosh] of this total design responsibility." R.23, Ex.E, at ¶ C.6.1. The production contract also defined extensive performance, dimension and container requirements for the MK–48. The contract provided that, among other requirements, the MK–48 must be able to fit inside an 8 feet × 8 feet × 20 feet flat rack ANSI/ISO shipping container; be capable of external transport by helicopter; have the ability to ford up to five feet of water for up to five minutes; be able to restart a stalled engine while fording; have at least a forty-five degree angle of approach and departure; and have at least thirteen inches of ground clearance. In addition, the production contract provides that the MK–48 must comply with Federal Motor Carrier Safety Regulation 393.83,[2] *id.* at ¶ 3.2.9, and be "complete in all respects," *id.* at ¶ 3.1.

The initial proposal submitted by Oshkosh contemplated a single fifty-five gallon fuel tank on the left side of the vehicle, with the exhaust system mounted on the right side. At some point in the acquisition process, however, the Marine Corps increased the fuel capacity requirement. This increase led

---

**2.** Federal Motor Carrier Safety Regulation 393.83 prohibits the placement of an exhaust system part where "its location would likely re-

sult in burning ... the fuel supply." 49 C.F.R. § 393.83(a). For the complete text of FMCSR 393.83, *see infra* note 5.

to the addition of a second fifty-five gallon fuel tank, mounted on the right side of the vehicle. When the Marine Corps increased the fuel capacity requirement a second time, Oshkosh enlarged the fuel tanks to seventy-five gallons each. Although it is not clear at what point in the design process the two modifications of the fuel capacity requirement occurred, the evidence of record suggests that the prototype vehicles delivered by Oshkosh had the dual seventy-five gallon tank configuration. Major John Wozniak, the Marine officer who administered the MK–48 contract, testified at his deposition that the Marine Corps did not request any changes in the location of the fuel tanks during the testing of the prototypes; the configuration of the fuel tanks and the exhaust system remained constant through the testing and production phases of the procurement process.

The district court granted Oshkosh's motion for summary judgment. The court took the view that, with respect to each of the plaintiffs' claims, Oshkosh had established its entitlement to the government contractor defense. Accordingly, the district court entered summary judgment in favor of Oshkosh.

## II

## DISCUSSION

### A. *Standard of Review*

■ We review the district court's entry of summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir.1996). Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Normally, the burden is on the nonmoving party to establish a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In the present case, however, Oshkosh carries the burden of proving each element of the government contractor defense. *Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3d Cir.), *cert. denied*, 510 U.S. 868, 114 S.Ct. 191, 126 L.Ed.2d 150 (1993). In the context of this summary judgment motion, therefore, Oshkosh must demonstrate that there is no genuine issue of material fact for each element of the defense. *Id.* In other words, Oshkosh must come forward with evidence on summary judgment which would entitle it to a directed verdict if the evidence went uncontroverted at trial.

### B. *Government Contractor Defense—Design Defect Claim*

■ In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), the Supreme Court held that, under certain circumstances, government contractors are shielded from state tort liability for products manufactured for the Armed Forces of the United States. There is a "significant conflict," the Supreme Court held, between state law that would hold government contractors liable for design defects in military equipment and the "uniquely federal interest" in immunizing "the trade-off between greater safety and greater combat effectiveness." *Id.* at 511–12, 108 S.Ct. at 2518. The government contractor defense is derived from the government's immunity from suit when the performance of a discretionary function is at issue, the Court explained, and "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function." *Id.* at 511, 108 S.Ct. at 2518 (citing the Federal Tort Claims Act, 28 U.S.C. § 2680(a)).

■ The Supreme Court established a three-part test to determine if the government contractor defense applies:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the

United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518–19. The first two elements of the *Boyle* test ensure that "the design feature in question was considered by a Government officer, and not merely by the contractor itself." *Id.* The third element is necessary to eliminate any incentive that the government contractor defense may create for contractors to withhold knowledge of risks.

### 1.

As the district court recognized, the first prong of the *Boyle* test—whether the government has "approved reasonably precise specifications"—involves a number of different considerations. We must determine whether, and to what extent, the Marine Corps delegated discretion over the design of the MK–48 to Oshkosh. We also must discern whether the Marine Corps' approval of the design was meaningful, or merely a formality, and whether the specifications at issue were reasonably precise.

Our colleagues in other circuits have enumerated some of the considerations that inform the determination of whether the government has approved "reasonably precise specifications" for purposes of the government contractor defense. In *Stout v. Borg–Warner Corp.*, 933 F.2d 331 (5th Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991), the Fifth Circuit held that government contractor defense is available where "review [of the project] involved, *inter alia*, [the contractor's] submission of detailed drawings at various progressive stages of the design, critical design reviews where [government] engineers critiqued [the contractor's] work, and, finally, the production of prototype models tested and evaluated for months by the [government] for its actual performance." *Id.* at 336. The Eleventh Circuit has held that *Boyle*'s first condition is satisfied where the design of the military hardware was the product of a " 'continuous back and forth' " between the government and the contractor. *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1320 (11th Cir.1989) (quoting *Koutsoubos v.*

*Boeing Vertol*, 755 F.2d 352, 355 (3d Cir.), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985)), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990). Indeed, "[i]t is this salient fact of governmental participation in the various stages of the [equipment's] development that establishes the military contractor defense." *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698, 700–01 (4th Cir.1989), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990); *see Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480 (5th Cir.) (noting that, if the government engages in meaningful review of the design, the first element of the *Boyle* test is established), *cert. denied*, 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989).

■ With these considerations in mind, we agree with the district court that Oshkosh has satisfied the first element of the *Boyle* test. The government's participation in the design of the MK–48 was, in both a procedural and a substantive sense, extensive. Procedurally, the design of the MK–48 evolved through a cooperative and "continuous back and forth" between the Marine Corps and Oshkosh. *Harduvel*, 878 F.2d at 1320. The Marine Corps also exercised, through a detailed set of performance and dimension specifications, a considerable amount of substantive input into the design of the MK–48. The design process, viewed as a whole, establishes that the Marine Corps made a series of discretionary decisions concerning the design of the MK–48 and its suitability for military mission requirements.

The evidentiary materials submitted to the district court establish that Oshkosh and the Marine Corps worked closely together on the development of the MK–48, from its planning stages through full production. The initial proposal called for the exhaust system to be placed on the right side of the vehicle, away from the single fifty-five gallon fuel tank on the left side. When the Marine Corps insisted upon having a larger fuel capacity, however, a second fuel tank was added to the right side of the vehicle. A second increase in the fuel capacity requirement resulted in the expansion of the twin fuel tanks to seventy-five gallons each, crowding the exhaust system even further. At one point during the design

process, moreover, the government reduced the overall height limitation from 102 inches to 96 inches. This change in the height specification required the exhaust pipe, which lies directly above and parallel to the right side fuel tank, to be moved six inches closer to the fuel tank. It is clear, therefore, the Marine Corps did not leave "the critical design decisions to the private contractor," *Trevino*, 865 F.2d at 1480, but rather that the Corps worked with Oshkosh every step of the way. *See Harduvel*, 878 F.2d at 1320; *Kleemann*, 890 F.2d at 700–01.

■ The Marine Corps needed the MK–48 to have two seventy-five gallon fuel tanks; the ability to ford through five feet of water; the ability to restart a stalled engine while fording; the ability to fit into an 8 feet × 8 feet × 20 feet shipping container; and the ability to be transported externally by helicopter. This combination of specifications cabined significantly the placement of the exhaust system and the fuel tanks. Each seventy-five gallon fuel tank requires over ten cubic feet of space, and the exhaust pipe itself is approximately twelve inches in diameter. The district court was justified in concluding, as a matter of law, that this combination of specifications prevented Oshkosh from complying "both with its contractual obligations and the state-prescribed duty of care." *Boyle*, 487 U.S. at 509, 108 S.Ct. at 2517; *see Harduvel*, 878 F.2d at 1316 ("Application of ordinary tort law to military designs is not appropriate, for the government 'is required by the exigencies of our defense effort to push technology toward its limits and thereby incur risks beyond those that would be acceptable for ordinary consumer goods.'") (quoting *Tozer v. LTV Corp.*, 792 F.2d 403, 406 (4th Cir.1986), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988)). Nor does the fact that Oshkosh may have retained some discretion to position the fuel tanks and exhaust system within the envelope permitted by the specifications, standing alone, defeat the government contractor defense. *See Boyle*, 487 U.S. at 513, 108 S.Ct. at 2519 ("The design ultimately selected may well reflect a significant policy

judgment by the Government officials whether or not the contractor rather than those officials developed the design. It does not seem to us sound policy to penalize, and thus deter, active participation in the design process, placing the contractor at risk unless it identifies all design defects."); *see, e.g., Wheeled Coach*, 991 F.2d at 1125 ("Although [the applicable specification] permitted [the contractor] to place the center of gravity anywhere below the maximum height of forty-three inches, the government need not deprive the manufacturer of all discretion pertaining to a particular design feature in order for the government contractor defense to apply.").

The record is clear, moreover, that the various stages of Marine Corps approval exceeded mere rubber stamping of Oshkosh's work. *See Trevino*, 865 F.2d at 1480 ("When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion"). The Marine Corps considered—and rejected—a number of design modifications, including the integration of armor and explosion suppressant materials into the design of the fuel system.[3] This is not a case where the government simply accepted, without substantive review or evaluation, the contractor's exercise of discretion in meeting a given performance standard. *See Boyle*, 487 U.S. at 509, 108 S.Ct. at 2517.

The record in this case supports the district court's conclusion that, given the Marine Corps' involvement in the design process and its substantive input, the configuration of the fuel and exhaust systems amounts to the type of deliberate trade-off between military mission requirements and safety concerns that is at the heart of the government contractor defense. *See Boyle*, 487 U.S. at 511, 108 S.Ct. at 2518 ("[P]ermitting 'second guessing' of these [trade-off] judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption [for discre-

---

**3.** It is not clear, however, whether the Marine Corps considered the use of armor and an explo- sion suppressant to address the danger of a side-impact collision.

tionary conduct]."); *Kleemann*, 890 F.2d at 700 (same).[4]

## 2.

■ To establish the second element of the *Boyle* test, Oshkosh must demonstrate that the MK–48 conformed to the "reasonably precise specifications" approved by the government. *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518. The plaintiffs assert that the MK–48 failed to conform to two of the specifications in the production contract: (1) the requirement that the vehicles comply with Federal Motor Carrier Safety Regulation 393.83,[5] *see* R.23, Ex.E, at ¶ 3.2.9; and (2) the requirement that the vehicles be "complete in all respects," *id.* at ¶ 3.1.[6] Specifically, the plaintiffs submit that Oshkosh located the exhaust pipe where it likely will result in the ignition of the MK–48's fuel supply, in violation of FMCSR 393.83, and that, given this propensity, the MK–48 was not "complete in all respects" as ordinarily would be delivered in the heavy truck transport industry.

■ With respect to each of these contractual provisions, therefore, the plaintiffs rely on the assertion that the MK–48's exhaust pipe is positioned dangerously close to the right side fuel tank. As the district court correctly pointed out, the defect forming the basis of the nonconformities alleged by the plaintiffs is one of design—and not one of manufacture. The plaintiffs do not allege, for example, that one of the MK–48s involved in the accident had a fuel tank that was less sturdy than the fuel tanks installed on all of the other MK–48s manufactured by Oshkosh. Rather, it is the plaintiffs' position that, by virtue of the exhaust system and fuel tank configuration, all of the MK–48s produced by Oshkosh do not conform to the production contract. Stated differently, the plaintiffs allege that the intended configuration of these systems is capable of producing an unintended result. This is the hallmark of a design defect. *See Harduvel*, 878 F.2d at 1317 (distinguishing between design and manufacturing defects in the context of the government contractor defense).

As the Eleventh Circuit explained in *Harduvel*, however, the assertion of a design defect is itself subject to the *Boyle* defense:

> To say that a product failed to conform to specifications is just another way of saying that it was defectively manufactured. . . . Plaintiff did present substantial evidence that the design—not the manufacture—of the F–16's wiring system was susceptible to dangerous wire chafing, but that claim is subject to the *Boyle* defense. The [conforming product] condition for application of the defense is present here as a matter of law.

4. The plaintiffs submit that the production contract specifically allocates discretion for the design of the MK–48 to Oshkosh. They rely heavily on language in the production contract indicating that Oshkosh has "total design responsibility" for the MK–48 and that "submission and approval or disapproval by the government of any changes shall in no way relieve [Oshkosh] from complying with" this responsibility. R.23, Ex.E, at ¶ C.6.1. The interpretation of the "total responsibility clause" urged by the plaintiffs, however, is belied both by the timing of the production contract and by the conduct of the parties. At the time that the contract was executed, much of the design and substantive testing of the MK–48 had been completed; Oshkosh and the Marine Corps, working together, already had made hundreds of changes to the design of the MK–48.

5. In relevant part, Federal Motor Carrier Safety Regulation 393.83 provides:
 **393.83 Exhaust Systems.**
 (a) Every motor vehicle having a device (other than as part of its cargo) capable of expelling harmful combustion fumes shall have a system to direct the discharge of such fumes. No part shall be located where its location would likely result in burning, charring, or damaging the electric wiring, the fuel supply, or any combustible part of the motor vehicle.
 49 C.F.R. § 393.83(a).

6. Paragraph 3.1 of the production contract provides, in relevant part:
 **Basic Vehicle System and/or Components, Parts and Accessories.** The basic power/powered trucks or vehicle system of the type described in this specification, hereinafter referred to as "the vehicle," shall be comprised of components, parts and accessories which are standard commercial and which meet or exceed the requirements of this specification. The vehicle shall be complete in all respects, as would normally be delivered to the commercial heavy truck transport and construction equipment industry.
 R.23, Ex.E, at ¶ 3.1.

*Id.* at 1321. Given our earlier conclusion that the Marine Corps approved reasonably precise specifications, it is clear that the placement of the exhaust pipe and the fuel tanks "satisfies an intended configuration." *Id.* at 1317. Oshkosh did not deviate from the Marine Corps' specifications; rather, the configuration of the fuel tanks and the exhaust system was determined, to a significant extent, by the Corps' dimension, performance and operation specifications. As in *Harduvel,* therefore, *Boyle*'s second element is present here as a matter of law.

### 3.

The third and final element of the government contractor defense requires the contractor to have warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19.

▮ According to Oshkosh, the Marine Corps was aware of the dangers associated with the configuration of the exhaust and fuel systems. This knowledge, Oshkosh submits, can be inferred from the fact that the Corps considered the use of armor and explosion suppressants in connection with the fuel supply. We are unable to accept this proposition. There is no evidence that the Marine Corps considered these improvements to address the risk of an explosion caused by the proximity of the exhaust system to the fuel tanks. From all that appears, the Corps considered these improvements solely to address the risks of enemy fire and accidents during refueling. Under these circumstances, it is difficult to conclude as a matter of law that the Marine Corps possessed this knowledge. As we explain below, however, we do not believe that this factor precludes summary judgment.

▮ We are unable to conclude that Oshkosh was aware of any danger associated with the configuration of the fuel tanks and exhaust system that the Marine Corps was not. There is no indication that Oshkosh

possessed any greater knowledge than the Marine Corps concerning the likelihood of an exhaust-ignited fuel tank fire. Oshkosh did not conduct any crash tests of the MK–48, and there is no evidence of record to suggest that Oshkosh was aware of any fires or explosions arising from any collision involving the MK–48 before the accident involving Corporals Tate and Oliver. The Marine Corps was responsible for the selection and implementation of all testing for the MK–48s, and the Corps elected not to conduct any crash tests of the vehicles—before or after production.

▮ Under these circumstances, there is no basis to believe that Oshkosh possessed any greater knowledge of the risk posed by the configuration of the exhaust pipe and the fuel tanks than did the Marine Corps. *Boyle* does not require the contractor to warn the government of every possible danger—only those known to it and not to the government. *See* 487 U.S. at 512, 108 S.Ct. at 2518–19. The evidence of record suggests that Oshkosh and the Marine Corps were equally knowledgeable concerning the likelihood of an exhaust-ignited fire following a side-impact collision and, to the extent that Oshkosh was aware of a danger from the ignition of fuel, we believe that the warnings contained in Oshkosh's Safety Assessment Report are sufficient to communicate that danger to the government for purposes of the government contractor defense.[7] On the record before us, therefore, the district court was justified in concluding that the third requirement of *Boyle* is satisfied as a matter of law. *See also Boyle,* 487 U.S. at 513, 108 S.Ct. at 2519.

▮ *Boyle* makes clear that the government contractor defense is intended to protect military contractors from state tort liability when they produce equipment conforming to design specifications adopted by government agencies in the exercise of their discretion. On the basis of this record, we must conclude that this is such a case. Accordingly, we affirm the judgment

---

7. Paragraph 21 of the Safety Assessment Report warns that "[f]uel is very flammable and can explode easily" and that "[f]uel can be ignited by a hot engine." R.23, Ex.E, at ¶ 21. Additionally, the report identifies "fire from vehicle fuel" as a "significant hazard" and diesel fuel as a "hazardous material." *Id.* at ¶¶ 5.1, 5.2.

of the district court with respect to the plaintiffs' design defect claims.

### C. *Third–Party Beneficiary Claims*

■ The plaintiffs maintain that the government contractor defense does not preclude all of their theories of recovery against Oshkosh. Because the purpose of the government contractor defense is to prevent conflicts between state tort duties and the federal duties created by the government contract, they assert, the government contractor defense does not bar, as a matter of law, those theories of recovery that do not conflict with Oshkosh's duties under the production contract. Accordingly, the plaintiffs continue, the government contractor defense does not apply to theories of recovery based on the duties created by the government production contract itself: (1) the requirement that the MK–48 comply with FMCSR 393.83; and (2) the requirement that Oshkosh deliver a vehicle which is "complete in all respects." Specifically, the plaintiffs attempt to enforce these contractual provisions under a third-party beneficiary theory of recovery.

We believe that *Boyle* precludes this alternate theory. The plaintiff in that case had taken the position that, in disputes solely between private parties, there is no federal interest warranting application of the government contractor defense. The Supreme Court rejected this position. Justice Scalia, writing for the Court, noted that there are third-party beneficiary situations in which the federal interest is "too remote a possibility" or "far too speculative" to raise the realistic possibility that adjudication of the claim under state law would interfere with federal interests. *Boyle,* 487 U.S. at 506, 108 S.Ct. at 2515 (quoting *Miree v. DeKalb County,* 433 U.S. 25, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977)). Notably, the Justice went on to contrast those third-party beneficiary situations, such as *Boyle,* in which the federal interest justifies the displacement of state law:

> But the same is not true here. The imposition of liability on Government contractors will directly affect the terms of government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected.

*Boyle,* 487 U.S. at 506–07, 108 S.Ct. at 2515–16 (distinguishing *Miree*).

■ Accordingly, the plaintiffs' invocation of a third-party beneficiary theory cannot, standing alone, lift the shield of the government contractor defense. As our colleagues in the Second Circuit emphasized in *Lewis v. Babcock Industries, Inc.,* 985 F.2d 83, 86–87 (2d Cir.), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993), the *Boyle* paradigm determines whether there is a "significant conflict" between the requirements of the government contract and the duty of care imposed by state tort law. Indeed, the purpose of the first element of the test—government approval of reasonably precise specifications—is to determine whether the requisite conflict with state law exists. *See Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19 ("The first two [conditions of the three-prong test] assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated."); *Lewis,* 985 F.2d at 85. When the government has approved reasonably precise specifications for a piece of military hardware, state law that would impose liability on the contractor necessarily impedes the federal interest in immunizing contractor compliance with those specifications.

At bottom, the plaintiffs' third-party beneficiary claims are grounded in the assertion that they are entitled to enforce the provisions in the production contract that require the MK–48 to comply with FMCSR 393.83 and to be "complete in all respects." These claims rely in turn on the assertion that the MK–48's exhaust pipe is positioned dangerously close to the right side fuel tank—the same design defect that forms the basis of the design defect claim precluded by *Boyle.* Given our earlier conclusion that, with respect to that design matter, the Marine Corps approved reasonably precise specifications with respect to the exhaust and fuel systems, the third-party beneficiary contract claims urged by the plaintiffs implicate the

same discretionary function of the government-and the federal interests identified by the Supreme Court in *Boyle*. Thus, we conclude that summary judgment was appropriate with respect to the plaintiffs' third-party brief theory as well.

### D. *Failure–To–Warn Claim*

The plaintiffs submit that, even if Oshkosh has established its entitlement to the government contractor defense with respect to the design of the MK–48, their failure-to-warn claims under Wisconsin law should survive summary judgment. They renew their contention, rejected by the district court, that, in order for the government contractor defense to apply to a failure-to-warn claim, Oshkosh must show that the government either prohibited warnings altogether or dictated the contents of the warnings.

 It is well established that the government contractor defense articulated by the Supreme Court in *Boyle* may operate to defeat a state failure-to-warn claim. *See Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 586 (9th Cir.1996); *In re Joint Eastern and Southern Dist. New York Asbestos Litig.*, 897 F.2d 626, 629 (2d Cir.1990) (collecting cases). The defense applies to failure-to-warn cases because the "significant conflict" identified by the Supreme Court in *Boyle* is equally present when a federal contract and state tort law differ as to the nature and content of required product warnings. *See Tate v. Boeing Helicopters*, 55 F.3d 1150, 1157 (6th Cir.1995) ("[W]hen the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability."). "Just as with conflicting federal and state design requirements, the existence of conflicting federal and state warning requirements can undermine the Government's ability to control military procurement." *In re New York Asbestos Litig.*, 897 F.2d at 629; *see Tate*, 55 F.3d at 1157 (noting that, as in design defect cases, "when the government exercises its discretion and approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn liability").

 It is also well established, however, that a defendant may not defeat a state failure-to-warn claim simply by establishing the elements of the government contractor defense with respect to a plaintiff's design defect claim. *See Tate*, 55 F.3d at 1156–57; *In re New York Asbestos Litig.*, 897 F.2d at 632. As our colleagues in the Sixth Circuit have explained,

> design defect and failure to warn claims differ practically as well as theoretically. Simply because the government exercises discretion in approving a design does not mean that the government considered the appropriate warnings that ought to accompany the product.

*Tate*, 55 F.3d at 1156.

 Nevertheless, because similar policy considerations control both design defect and failure-to-warn situations, *Boyle* provides substantial guidance in determining whether state law governing a failure-to-warn claim can be displaced. *See id.* at 1157. In both cases, the discretionary aspect of the federal government's contracting function must define the boundaries of the government contractor defense. *See Boyle*, 487 U.S. at 511–12, 108 S.Ct. at 2518–19. In *Boyle*, the Supreme Court established the requirement that the "government approve reasonably precise specifications" as the test of whether a particular case implicates a discretionary function of the government. 487 U.S. at 512, 108 S.Ct. at 2518–19. We believe that the same touchstone ought to govern in the context of failure-to-warn claims. As the Sixth Circuit put it, "[w]hen the government exercises its discretion and approves designs prepared by private contractors, it has an interest in insulating its contractors from liability for such design defects. Similarly, when the government approves warnings intended for users, it has an interest in insulating its contractors from state failure to warn tort liability." *Tate*, 55 F.3d at 1157. Thus, when state law would otherwise impose liability for a failure to warn, that law can be displaced when the contractor can show that: (1) the government exercised its discretion and approved certain warnings; (2) the contractor provided the warnings required by the government;

(3) the contractor warned the government about dangers in the equipment's use that were known to the contractor but not to the government.[8] With respect to the first of these factors, the government's approval must, as in the case of product design matters, go beyond merely "rubber stamping" the contractor's choice. If the government chooses its own warnings, the contractor has certainly fulfilled this first condition.

When design defect issues are combined with failure-to-warn issues, litigants often fail to expend the same energy litigating the warning issue as they expend on the design defect issue. This case fits that all-too-familiar pattern. Nevertheless, upon examination of the record, we believe that the district court properly granted summary judgment to the defendant. We believe that the undisputed facts of record show that Oshkosh complied with "reasonably precise specifications" imposed on it by the Marine Corps with respect to the warnings on the MK–48 and that the contractor provided those warnings required by the government. In this respect, Oshkosh invites us to the affidavit of Danny J. Lanzdorf, Oshkosh's Chief Engineer for the MK–48. Paragraph 2 of his affidavit provides that "[h]undreds of plans, drawings and specifications were submitted to the U.S. Marine Corps, but the [drawings] attached [to the affidavit] are representative of those reviewed and approved." R.40, Ex.B, at ¶ 2. The drawings attached to the affidavit show several different views of the MK–48 and depict the locations of warnings and component parts such as the exhaust system, mufflers and the fuel tank. With respect to the final element of the government contractor defense, we note our earlier

conclusion that Oshkosh did not fail to warn the Marine Corps of any dangers in the use of the MK–48 that were known to Oshkosh but not to the Marine Corps. Under these circumstances, the district court properly entered summary judgment to Oshkosh on the plaintiffs' failure-to-warn claims.

### Conclusion

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

**8.** We cannot accept as consistent with *Boyle* the suggestion that there is any strict requirement that the government "prohibit" warnings altogether or "dictate" the contents of the warnings actually incorporated. In support of their position, the plaintiffs invite our attention to the Ninth Circuit's decision in *In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 813 (9th Cir.1992) and to the Second Circuit's decision in *In re Joint Eastern and Southern District New York Asbestos Litigation*, 897 F.2d 626, 632 (2d Cir.1990). The position taken by the Ninth Circuit, however, does not appear to be as rigid as the plaintiffs submit. In the recent case of *Butler v. Ingalls Shipbuilding*, 89 F.3d 582 (9th Cir.1996), the Ninth Circuit stated that the government contractor defense may apply to a state failure-to-warn claim where the evidence shows that the defendant was "acting in compliance with 'reasonably precise specifications' imposed on it by the United States." *Id.* at 586 (quoting *In re Federal Asbestos Cases*, 960 F.2d at 813 (quoting in turn *Boyle*, 487 U.S. at 512)) (citing *In re New York Asbestos Litig.*, 897 F.2d at 629–32.) Nor are we convinced that the Second Circuit's holding in *In re Joint Eastern & Southern District New York Asbestos Litigation* necessarily states a more stringent standard than the one employed by the Sixth Circuit. *But see Tate*, 55 F.3d at 1157 (suggesting that *In re New York Asbestos Litigation* may state a more demanding standard).