**FINISHMASTER, INC., Plaintiff,**

v.

**WAUSAU BENEFITS, INC., Defendant.**

**No. 1:04–CV–1766–LJM–WTL.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 24, 2006.

---

Mary Terese Doherty, Sommer Barnard Attorneys, PC, Indianapolis, IN, for Plaintiff.

Brian William Thomson, Frederick W. Morris, Minneapolis, MN, Angela M. Smith, John Francis Williams, III, Hall Render Killian Heath & Lyman, Indianapolis, IN, for Defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MCKINNEY, Chief Judge.

This matter comes before the Court on Defendant's, Wausau Benefits, Inc. ("Wausau"), Motion for Summary Judgment. Plaintiff, FinishMaster, Inc. ("FinishMaster"), filed this lawsuit asserting state law claims of breach of contract and tortious conduct in the performance of contractual obligations. Specifically, FinishMaster contends that Wausau failed to timely pay health care expenses for one of FinishMaster's employees that resulted in a loss of coverage under a stop-loss insurance policy. Furthermore, FinishMaster alleges that Wausau failed to follow-up with the medical provider to ensure that a proper bill was timely submitted for payment. The parties have fully briefed this matter and it is now ripe for ruling.

For the reasons stated herein, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## I. BACKGROUND

FinishMaster is engaged in the automotive finishes business and provides health care benefits to its employees. Pruim Aff., ¶ 2. At all times relevant to this suit, FinishMaster self-funded its benefits plan. Pruim Aff., ¶ 3. FinishMaster entered into an agreement with Wausau to be the third-party administrator for the benefits plan. Pruim Aff., ¶ 7; Administrative Services Agreement ("ASA"). As plan sponsor and fiduciary, FinishMaster retained final authority and responsibility for operation of the benefits plan. ASA section 11.4.

In addition, FinishMaster purchased stop-loss insurance to limit its risk from potentially high health care claims. Pruim Aff., ¶ 6. FinishMaster purchased this insurance from National Benefit Resources, Inc. ("NBR") with the assistance of Wausau.[1] Pruim Aff., ¶ 8. The stop-loss policy in effect for 2003 provided FinishMaster with up to $2,000,000.00 in coverage for medical expenses incurred by a single plan participant that was in excess of $250,000.00. Pruim Aff., ¶ 9; FinishMaster's Stop–Loss Policy (Wausau's Appendix at 005). The policy only provided coverage for claims both incurred and paid within the same policy year. Pruim Aff., ¶ 9; FinishMaster's Stop–Loss Policy (Wausau's Appendix at 005). In other words, FinishMaster was responsible for the first $250,000.00 of a participant's claim, and beyond that "deductible" the stop-loss carrier provided reimbursement up to $2,000,000.00 provided that the claim amounts met the condition of being both incurred and paid in the same policy year. Pruim Aff., ¶ 9; FinishMaster's Stop–Loss Policy (Wausau's Appendix at 005).

In 2003, one of FinishMaster's employees, Frederick Jordan ("Jordan"), was hos-

---

1. Wausau and NBR had a separate agreement between them which provided that Wausau would help market NBR's insurance to its self-funded customers. Erickson's Depo., Ex. 26 (sealed exhibit).

pitalized in Newark, New Jersey, at Jersey Shore University Medical Center ("Jersey Shore") from September 18, 2003, through October 31, 2003, the day he passed away. Jersey Shore Summ. Bill (Wausau's Appendix at 136). Prior to Jordan's death, Wausau notified FinishMaster that the costs for Jordan's treatment were going to exceed the "deductible," and FinishMaster requested to be notified if the costs were going to be much more than $550,000.00. Hesse Aff., ¶ 5; Fenhaus Depo., Ex. 16 (Case notes at WAU0051–0052). Wausau did not follow-up with FinishMaster.[2] Hesse Aff., ¶ 6; Fenhaus Depo. at 69, Ex. 16 (Case notes at WAU0052).

Jersey Shore initially sent its bill for services to Medicare on November 21, 2003. Jersey Shore Bill Tracking Records (Wausau's Appendix at 145). A month later, Jersey Shore sent a summary of the bill to Wausau, which was received on December 29, 2003. Jersey Shore Bill Tracking Records (Wausau's Appendix at 145); Jersey Shore Summ. Bill (Wausau's Appendix at 136); Fenhaus Depo. at 27–28, 57–58. The total charges for services came to $658,460.00. Jersey Shore Summ. Bill (Wausau's Appendix at 136); Brunner Depo., Ex. 8 (Email correspondence of Wausau personnel). The ASA required Wausau to follow its procedures for processing and paying claims. ASA section 6. Pursuant to those procedures, bills in excess of $80,000.00 needed to be itemized. Fenhaus Depo. at 49. In fact, this was a common industry standard. Schact Depo. at 58–59. Wausau processed bills in the order that they were received. Fenhaus

Depo. at 51. Once the summary bill was entered on January 29, 2004, Wausau requested that Jersey Shore submit a more detailed bill, which was finally received on February 9, 2004, and consisted of 142 pages. Jersey Shore Detailed Bill (Wausau's Appendix at 169–310); Fenhaus Depo. at 27–28. After the bill was audited and discounts applied, it was released for payment on March 9, 2004, and a check was issued on March 15, 2004. Fenhaus Depo. at 26–27, 58. The total amount paid was $558,875.70. Brunner Depo., Ex. 8 (Email correspondence of Wausau personnel); Fenhaus Aff., ¶ 12. Because Jordan's claim was not paid before January 1, 2004, coverage under the stop-loss policy was denied. Erickson's Depo. at 15; Brunner Depo. at 54.[3]

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267–68 (7th Cir.1990), *cert. denied*, 499 U.S. 923, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

---

**2.** Around the same time that Jordan was receiving treatment, FinishMaster informed Wausau that it was considering the possibility of terminating their business relationship. Pruim Aff., ¶¶ 10–12. FinishMaster decided to terminate the business relationship in November 2003. Pruim Aff., ¶ 13.

**3.** FinishMaster had purchased another stop-loss policy from another company that apparently covered $133,230.00 of the Jordan claim. Letter dated October 26, 2005 (Wausau's Appendix at 329–30); FinishMaster's Response to Interrogatory No. 14 (Wausau's Appendix at 353–54).

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir.2003), *reh'g denied.* Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec, Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992).

In evaluating a motion for summary judgment, a court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir.1996), *cert. denied*, 519 U.S. 1109, 117 S.Ct. 945, 136 L.Ed.2d 834 (1997). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996), *cert. denied*, 519 U.S. 1115, 117 S.Ct. 957, 136 L.Ed.2d 843 (1997).

## III. DISCUSSION

### A. WAUSAU'S PREEMPTION ARGUMENT

■ As an initial matter, Wausau contends that FinishMaster's state law claims are subject to complete preemption under the Employment Retirement Income Security Act ("ERISA"). As a result, according to Wausau, the claims must be dismissed.

■ With certain exceptions not relevant here, ERISA's preemption clause provides that ERISA "shall supersede any and all State laws insofar as they may now

938

or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). As the Supreme Court has provided, a law "relates to" an employee benefit plan "if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The broad "connection with" language in *Shaw* is not usually interpreted literally, however. Indeed, the Supreme Court has cautioned lower courts to evaluate allegations of preemption with the starting presumption that Congress does not intend to supplant state law. *See N.Y. Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654–55, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). For the purposes of ERISA's preemption clause, a federal court must look "to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.* at 656, 115 S.Ct. 1671. These objectives are also to be used to determine the nature of the effect of the state law on ERISA plans. *See Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 325, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997).

ERISA's primary objectives are to "protect ... the interests of participants ... and their beneficiaries, by requiring the disclosure and reporting ... of financial and other information ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts," 29 U.S.C. § 1001(b), and "by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance." 29 U.S.C. § 1001(c) In addition, when Congress enacted section 1144(a), it intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law. *See Trustees of AF-TRA Health Fund v. Biondi,* 303 F.3d 765, 774–75 (7th Cir.2002) (citing *Travelers,* 514 U.S. at 656–57, 115 S.Ct. 1671). Its goal was to minimize the administrative and financial burden of complying with conflicting directives among states or between states and the federal government and to prevent the potential for conflict in substantive law, which would require the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction. *See id.*

■ With these objectives in mind, the Supreme Court has identified at least three instances where a state law can be said to have a "connection with" or a "reference to" employee benefit plans. *Id.* at 775. Specifically, these include instances when the state law (1) "mandate[s] employee benefit structures or their administration;" (2) binds employer or plan administrators to particular choices or precludes uniform administrative practice so as to function as a regulation of an ERISA plan itself; and (3) provides an alternative enforcement mechanism to ERISA. *Id.* (internal citations omitted).

Here, FinishMaster's claims are based solely on Wausau's duties under the ASA. The propriety of those claims hinges on analysis of a contract, an area of law that is traditionally state regulated. Therefore, Wausau bears a considerable burden in overcoming the starting presumption that Congress does not intend to supplant state law. *See De Buono v. NYSA–ILA Med. & Clinical Servs. Fund,* 520 U.S. 806, 814, 117 S.Ct. 1747, 138 L.Ed.2d 21 (1997). Wausau has not met this burden in this case. FinishMaster's claims do not impact plan structure or administration, do not bind employers or administrators to particular choices, and do not preclude uniform administrative practice. In fact, the

claims do not require the Court to interpret or apply any of the terms of the employee benefit plan as FinishMaster makes no claim based on any right under the plan or that the plan has been breached. Instead, its claims present a "garden variety" commercial dispute that bears no relationship to plan interpretation. Accordingly, the Court concludes that Finish-Master's claims are not preempted by ERISA. *See Biondi,* 303 F.3d at 783; *Indep. Distrib. Coop. USA v. Advanced Ins. Brokerage of Am., Inc.,* 264 F.Supp.2d 796, 805 (S.D.Ind.2003).

## B. FINISHMASTER'S CLAIMS

■ Both FinishMaster and Wausau agree that the ASA governs their dispute and that the ASA explains Wausau's obligations. The parties dispute what the "plain language" of the ASA means when it comes to those obligations. The foundation of FinishMaster's claims is that Wausau was obligated to ensure that Jersey Shore, the medical provider, timely submitted a proper bill for payment. Finish-Master contends that Wausau's failure to do so violated Sections 4, 6, and 8 of the ASA.

■ At the time of entering into the agreement, the parties agreed that the ASA would be governed and construed in accordance with Wisconsin law. ASA section 14.6. The Wisconsin Supreme Court, consistent with general practice, has stated that the primary goal in contract interpretation is to determine and give effect to the intention of the parties at the time that the contract was made rather than to reform a contract after the fact to fit someone else's view of what the most equitable division of rights and duties should have

been. *See Farm Credit Serv. of N. Cent. Wis., ACA v. Wysocki,* 2001 WI 51, ¶ 12, 243 Wis.2d 305, ¶ 12, 627 N.W.2d 444, ¶ 12; *Zweck v. D P Way Corp.,* 70 Wis.2d 426, 434, 234 N.W.2d 921, 926 (1975). When the language of a contract is unambiguous, Wisconsin courts will apply the literal or plain meaning of the contract. *See Wysocki,* 2001 WI 51, ¶ 12, 243 Wis.2d 305, ¶ 12, 627 N.W.2d 444, ¶ 12. On the other hand, when a contract provision is ambiguous, Wisconsin courts look to extrinsic evidence to discern the contract's meaning. *See id.* Where contract terms may be taken in two senses, evidence of practical construction by the parties is highly probative of the intended meaning of those terms and Wisconsin courts will normally adopt that interpretation of the contract that the parties themselves have adopted. *See Zweck,* 70 Wis.2d at 435, 234 N.W.2d at 926.

Turning to the disputed provisions of the ASA, the Court concludes that there is nothing in the plain language of those provision that required Wausau to ensure that Jersey Shore timely sent a proper bill for payment of services rendered to Jordan. First, section 4 explains the general responsibilities of Wausau under the ASA. In particular, Wausau agreed to provide information to FinishMaster "relative to the claim experience under the Plan, including certain underwriting evaluation and cost projections," ASA section 4.1, and agreed to use certain administrative procedures in the performance of its obligations and instruct FinishMaster on the implementation of those procedures. ASA section 4.3.[4] An addendum to the ASA explains the performance standards for administering claims. Nothing in section 4 or this ad-

---

4. Section 4.5 also provided that, at Finish-Master's request, Wausau would provide certain special services for additional fees detailed in Exhibit A, but FinishMaster has not argued that the obligation it seeks to impose

fits under those special services, and the Court sees nothing in Exhibit A that would impose an obligation to ensure that a medical provider timely submits a proper bill for services.

dendum mentions anything about following up with medical providers for bills.

Likewise, nothing in the plain language of section 6 imposes such an obligation. This section relates to claim services. Section 6.1 simply requires Wausau to review claims that are received and to arrange for prompt payment of those claims for which a plan participant is entitled to any benefits. Section 6.2 provides that Wausau will only accept those claims that are submitted in accordance with established rules and procedures and that review of claims and determination of benefits will be done in accordance with established rules and procedures. Section 6 says nothing about following up with a medical provider to ensure that a proper bill is timely submitted for payment.

Finally, there is nothing in section 8 of the contract that discusses the alleged obligation that FinishMaster claims Wausau failed to perform. Section 8 is entitled "Case Management and Hospital Audit." Under section 8.1, Wausau agreed to perform preliminary case management and auditing services by identifying "appropriate cases," conducting "certain preliminary work," and providing FinishMaster with a "cost/benefit estimate" for each case being managed. Wausau agreed that, upon completion of this preliminary work, it would seek approval from FinishMaster "before pursuing the case to its completion." ASA section 8.2. Like sections 4 and 6, there is nothing in section 8 that requires Wausau to ensure that medical providers like Jersey Shore timely submitted a proper bill for processing and payment.

Even if the Court looks beyond the four corners of the ASA in order to elucidate what obligations Wausau undertook and what is meant by "case management," as the parties suggest, the Court finds nothing to indicate that Wausau was obligated to perform the task of following up with medical providers to obtain medical bills. To the contrary, the evidence reveals that the standard custom and practice of the industry did not require such an undertaking. Specifically, it is undisputed that Richard Schact ("Schact"), Wausau's expert, testified that he would not expect third-party administrators to have a procedure to follow-up with a provider for a bill because this was not their job. Schact Depo. at 65–72. Further, Schact explained that case management involved an attempt to minimize cost on serious cases through monitoring and that the process typically ended once medical services ceased. Schact Depo. at 98–99. He stated that nothing in the process of case management obligated a third-party administrator to get a bill. Schact Depo. at 99. The testimony of one of Wausau's employees, Nancy Fenhaus ("Fenhaus") was consistent with Schact's testimony. She stated that Wausau was responsible for processing claims and not for soliciting providers for those claims. Fenhaus Depo. at 74–75. Like Schact, Fenhaus also explained that case management was a process for saving money on patient care and, in cases like that of Jordan, that the process ends when the patient dies. Fenhaus Depo. at 68, 74–75.

While FinishMaster points to evidence to suggest that Wausau was aware that there could be potential issues with payment and with coverage under the stop-loss insurance coverage, FinishMaster has failed to refute Wausau's evidence regarding Wausau's contractual obligations and has failed to present any other evidence to suggest or raise a question that sections 4, 6, or 8 required Wausau to solicit providers for medical bills. Therefore, the Court concludes that there is no evidence that Wausau was contractually obligated to ensure that Jersey Shore timely sent a proper bill for payment of services rendered to Jordan. Accordingly, summary judgment in Wausau's favor is appropriate.

## IV. CONCLUSION

Plaintiff, FinishMaster, Inc., has failed to present sufficient evidence from which the Court could find a genuine issue of material fact regarding its state law claims. Accordingly, the Court **GRANTS** defendant's, Wausau Benefits, Inc., Motion for Summary Judgment. Plaintiff's, FinishMaster, Inc., claims are hereby dismissed with prejudice.